UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------x

ISIK JEWELRY,

                            Plaintiff,

            v.                                                      MEMORANDUM
                                                                      AND ORDER
MARS MEDIA, INC., XL SPECIALTY
INSURANCE COMPANY, LOUD                              01-CV-8564 (ILG)
RECORDS, L.L.C., and ALBERT
JOHNSON a/k/a PRODIGY,

                            Defendants.

--------------------------------------------------x

GLASSER, United States District Judge:

        This case arises out of the filming of a video starring music artist Albert Johnson,

also known as Prodigy ("Johnson" or "Prodigy").  The video was filmed at Broadway

Stages in Queensbridge, New York (the "Site").  Plaintiff Isik Jewelry ("plaintiff") is a

sole proprietorship operated by Beth Isik which manufactures, sells and rents jewelry.

Plaintiff rented several pieces of jewelry to Johnson which he wore in the video.  On the

second day of filming, Johnson left the Site wearing the jewelry and was robbed at

gunpoint, resulting in the loss of the jewelry.  Plaintiff subsequently brought suit against

Johnson and the following entities involved in the video production:  LOUD Records,

LLC ("LOUD"), the record company that owned the video production pursuant to a

contract with Mars Media, Inc. ("Mars Media"), a video production company that LOUD

hired to produce the video; and XL Specialty Insurance Company ("XL"), the insurance

company that Mars Media hired for the production.

## FACTS

On December 5, 2000, Johnson's stylist, Rodney O'Neal McKnight ("O'Neal"), on behalf of Mars Media, asked Beth Isik to supply jewelry for a video starring Johnson. Obiol Decl. Ex. G, Isik Dep. at 110, ln. 18–20; 111, ln. 3. According to Isik, she agreed to be paid $750 per day of the video shoot on the condition that she was insured to protect the jewelry. Id. at 114, 16-22. Shortly after the phone call with O'Neal, Nina Kratsa ("Kratsa"), also of Mars Media, called Beth Isik to confirm the request that Isik supply the jewelry.

On December 5, 2000, Mars Media faxed plaintiff a Certificate of Liability Insurance (the "12/5 Certificate"), which named plaintiff as an Additional Insured. The Certificate reflected coverage of up to $3 million for damage to "Misc. Equip." Isik Decl. ¶¶ 10-11.

The video shoot took place on December 5 and 6, 2000. On December 5, Isik arrived at the Site at about 1:00 p.m. with the jewelry. The jewelry (hereinafter the "jewelry") consisted of: "(1) a Cartier Watch, (2) an 18K Diamond Bracelet, (3) a 14K Diamond Bezel Necklace, (4) a 14K Diamond Bezel Bracelet, (5) a 14K Diamond Bracelet, (6) a 14K Diamond Channel-set Cross, (7) a 14K Diamond Bubble Cross, (8) a 14K diamond ring, and (9) a gold necklace used for wearing one of the diamond crosses." Beth Isik Decl. ¶ 23; see also Compl. ¶ 26.[1] It is undisputed that Beth Isik remained on location for the entire day of shooting each of December 5 and 6. Johnson

---

[1] The record is inconsistent as to the number of items that plaintiff loaned for the video. In her declaration, Beth Isik states that "she proffered nine pieces of jewelry." Isik Decl. ¶ 23. In the complaint, however, plaintiff alleges that it loaned eight pieces of jewelry. Compl. ¶ 1.

56.1 Statement ¶¶ 11, 12. Around midnight on the evening of December 6, the final day of shooting, Johnson, wearing the jewelry, walked with Joseph Bryant out of the building. Obiol Decl. Ex. I, Johnson Dep. at 60, ln. 20-25. According to Johnson's deposition testimony, after Bryant got into a taxi cab and left, Johnson crossed the street to get "two gallons of water to bring home" from a convenience store. Id. at 71, ln. 5-8. As he crossed the street, two men approached him, pulled out a gun, took the jewelry and fled. Johnson 56.1 Statement ¶¶ 19, 1; Obiol Decl. Ex. I, Johnson Dep. at 67, ln. 5-9, 19-23. In addition to plaintiff's jewelry, a necklace belonging to Johnson was stolen. After the robbery, Johnson returned to the Site and told someone at the front desk to call the police. Id. at 71, ln. 12-16. Johnson then reported the robbery to two police officers who came to the Site. See Isik Decl. Ex. 4 (police report). He told the officers that the robbers took "three necklaces off me and a watch." Obiol Decl. Ex. I, Johnson Dep. at 73, ln. 20-21. During the time that Johnson was robbed, Beth Isik was in the wardrobe room waiting for him to return the jewelry. Obiol Decl. Ex. G, Isik Dep. at 140, ln. 2-4.

On December 7, 2000, plaintiff contacted Mars Media regarding the loss of the jewelry. Mars Media referred plaintiff to its in-house counsel, Randy Winograd ("Winograd"), who indicated that XL would contact plaintiff regarding an insurance claim for the jewelry. Then on December 14, 2000, Mars Media faxed plaintiff a second Certificate of Liability Insurance (the "12/14 Certificate"), which indicated a $150,000 "jewelry sublimit." According to plaintiff, Mars Media provided no explanation for the change in coverage.

On December 18, 2000, some of the jewelry was returned to the offices of LOUD in an unmarked envelope.  <u>See</u> Obiol Decl. Ex. G, Isik Dep. at 168, ln. 20-22; 169, ln. 4-15.  After being notified by Rich Isaacson, President of LOUD, Beth Isik went to LOUD's offices to examine the contents of the envelope.  According to Isik, the envelope contained five pieces of jewelry:  two pieces in substantially the same condition as when plaintiff rented them for the video shoot and three "facsimile" pieces that were similar, but not identical, to the pieces loaned by plaintiff for the shoot.  <u>Id.</u> at 171; <u>see also</u> Isik Decl. ¶ 53.

Plaintiff alleges that it met with Nicole Sheley ("Sheley"), an adjuster for XL on January 8, 2001.  Sheley examined the returned pieces of jewelry and photographed them.  In early March, Sheley contacted plaintiff and indicated that XL was processing plaintiff's claim.  Plaintiff contends that at that time, it provided XL with full documentation of the stolen jewelry.  Pl. Mem. at 11.  Although plaintiff spoke several times with XL in March and April of 2001, XL did not offer any compensation for the jewelry.  On April 18, 2001, Ben Isik, writing on behalf of plaintiff, sent Winograd of Mars Media a letter enclosing documentation of the value of the lost jewelry.  On April 30, 2001, David Owen, Esq., writing on behalf of plaintiff, sent a letter to Winograd demanding payment for the jewelry.  Plaintiff was never compensated for its loss.

Plaintiff filed its complaint on December 26, 2001 and a First Amended Complaint on August, 30 2002.[2]  Pending before the Court are the following motions: (1) plaintiff's motion and Johnson's cross-motion for summary judgment with respect to plaintiff's negligence claim against Johnson as a bailee; (2) plaintiff's motion and

---

[2]  All references herein to "Compl." are to the First Amended Complaint.

Johnson's cross-motion for summary judgment with respect to plaintiff's breach of bailment claim; (3) plaintiff's motion for summary judgment with respect to its negligence claim against Mars Media as a bailee; (4) LOUD's motion for summary judgment with respect to plaintiff's negligence claim against it as a bailee; (5) plaintiff's motion and Johnson's cross-motion for summary judgment with respect to plaintiff's conversion claim; (6) plaintiff's motion for summary judgment with respect to its breach of contract claim against Mars Media; (7) plaintiff's motion and LOUD's cross-motion for summary judgment with respect to LOUD's *respondeat superior* liability; and (8) plaintiff's motion for summary judgment with respect to its breach of contract claim against XL.[3]

## **DISCUSSION**

Federal Rules of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is precluded only where the factual issue is genuine, which means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In

order to survive a motion for summary judgment, "the opponent must do more than

---

[3] Mars Media moved for partial summary judgment on plaintiff's Second Claim for Relief alleging fraudulent misrepresentation. XL moved for partial summary judgment on plaintiff's Seventh Claim for Relief alleging bad faith refusal to settle an insurance claim. According to plaintiff's memorandum of law, it withdraws these claims. Pl. Opp. to LOUD/Johnson at 2 n.2. Accordingly, the Court dismisses those claims for relief.

simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  To that end, the non-moving party "may not rest upon the mere allegations or denials" in its pleadings; rather, it "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts … must be viewed in the light most favorable to the party opposing the motion." <u>Matsushita</u>, 475 U.S. at 587.  Guided by these principles, the Court turns to the parties' arguments in this case.

## I. <u>Negligence Against Johnson</u>

Plaintiff moves and Johnson cross-moves for summary judgment as to plaintiff's claim for negligence against Johnson as a bailee of the jewelry.  Plaintiff argues that Johnson was a bailee because Beth Isik delivered the jewelry to him on December 5 and 6; Johnson accepted such delivery; and "Isik thereby relinquished its exclusive possession, control and dominion of the Jewelry."  Pl. Mem. at 17.  Johnson moves for summary judgment, arguing that he did not possess exclusive custody and control over the jewelry as required for a bailment.  Johnson Mem. at 4.

"A bailment is defined as a delivery of personal property for some particular purpose, or a mere deposit, upon a contract express or implied, and that after such purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions or kept until he reclaims it, as the case may be.  It is essential that there be either an actual or constructive delivery by the bailor as well as actual or constructive acceptance by the bailee." <u>Herrington v. Verrilli</u>, 151 F. Supp. 2d 449, 457 (S.D.N.Y. 2001) (quoting <u>Osborne v. Cline</u>, 263 N.Y. 434

(1934)).[4]

As an initial matter, Johnson argues there was no agreement between him and plaintiff. Johnson Mem. at 3. While he concedes that a bailment may be based on either an express or implied agreement, Johnson argues that plaintiff's own deposition testimony establishes that there was no agreement constituting a bailment. Johnson Mem. at 3; Johnson Reply Mem. at 2-3. Specifically, Johnson refers to the following testimony:

> Q: At any time did you enter into any agreement with Prodigy?
> ... regarding the jewelry, any agreement regarding the jewelry you brought to the set...?
> A: No.

Obiol Decl. Ex. G, Beth Isik Dep. at 246, ln. 25; 247, ln. 13 (emphasis added).

The law, however, does not require a formal agreement for a bailment. "It is the element of lawful possession, however created, and duty to account for the thing as the property of another, that creates the bailment, regardless of whether such possession is based on contract in the ordinary sense." Armstrong v. Sisti, 242 N.Y. 440, 444 (1926); see also Ellish v. Airport Parking Co., 42 A.D.2d 174, 176 (2d Dept. 1973) ("A bailment is, of course, merely a special kind of contract; it describes a result which in many instances does not flow from the conscious promises of the parties made in a bargaining process but from what the law regards as a fair approximation of their expectations."). "The determination as to whether the relationship is one of bailor and bailee turns on whether there is a relinquishment of exclusive possession, control and dominion over the property." Hutton v. Public Storage Mgmt., Inc., 177 Misc. 2d 540, 541 (N.Y. Sup.

---

[4] The parties do not dispute that plaintiff satisfies the elements of delivery and acceptance.

Ct. 1998) (holding there was no bailment with regard to rental agreement between parties because plaintiff did not relinquish exclusive control over property to defendant where plaintiff had direct access to storage space and his own lock, for which defendant did not have the key or the combination). Whether there is such a relinquishment "depends on the intentions and understanding of the parties as demonstrated by the place, conditions and nature of the transaction." Makower v. Kinney Sys., 65 Misc. 2d 808, 810 (N.Y. Civ. Ct. 1970).

Johnson argues that plaintiff did not transfer exclusive possession of and control over the jewelry because Beth Isik remained at the location for the entire day on December 6, 2000. Johnson Reply Mem. at 4. It is undisputed that Beth Isik went to the Site with the jewelry on December 6, 2000. See Pl. 56.1 Statement ¶ 36. Furthermore, it is undisputed that she remained at the location that entire day while Johnson wore the jewelry during the filming of the video. See Pl. Rule 56.1 Statement ¶¶ 30, 24; Johnson Rule 56.1 Statement ¶ 12; Obiol Decl. Ex. G, Isik Dep. at 127, ln. 3-5. According to her deposition testimony, Beth Isik remained on the set "To see what's going on. To stay to, you know, make sure that I kept an eye on my jewelry and that I was present." Obiol Decl. Ex. G, Isik Dep. at 251, ln. 4-6. When the shoot ended, Beth Isik was in the wardrobe room waiting for Johnson to return the jewelry. Id. at 139, ln. 8-10. At the end of the first night of shooting, Beth Isik took back all the jewelry that Johnson had worn during the shoot that day. Id. at 128, ln. 2-4. That plaintiff was present during filming and "kept an eye on [her] jewelry" suggests that even if Johnson possessed the jewelry by wearing it during each day of shooting, he did not exercise, and plaintiff did not relinquish, complete control over it.

There are other facts in the record, however, which suggest that plaintiff did relinquish complete control over the jewelry to Johnson. It is undisputed that Johnson left the Site wearing the jewelry. Obiol Decl. Ex. I, Johnson Dep. at 66, ln. 17-19. Plaintiff argues that the fact that Johnson, "without permission from anyone, decided unilaterally to wander off the set wearing the Jewelry," while Beth Isik was upstairs in a dressing room at the Site, indicates that it did not have control over the jewelry. Pl. Opp. at 10. Beth Isik testified that she last spoke to Prodigy on the morning of December 6. Obiol Decl. Ex. G, Beth Isik Dep. at 246, ln. 17-20. Moreover, Beth Isik testified that she never saw anyone other than Johnson wearing the jewelry during the first day of the shoot and that each time she saw Johnson he was wearing the jewelry. Id. at 127, ln. 14-20. Based on the disputed evidence above, the Court finds that there is a genuine question of material fact as to whether plaintiff relinquished exclusive possession of and control over the jewelry to Johnson.

Even assuming a bailment, however, plaintiff fails to present evidence sufficient to establish that Johnson's negligence caused the loss of its jewelry.[5] The failure of the bailee to return the property bailed creates a presumption of negligence, which requires the bailee to explain the loss. Voorhis v. Consolidated Rail Corp., 60 N.Y.2d 878, 879 (1983). "The fact of theft, if properly shown, would be relevant ... to the issue of whether defendant had overcome the presumption of negligence, assuming a bailment." Makower, 65 Misc. 2d at 810; see also Stewart v. Stone, 127 N.Y. 500, 506 (1891) (the

---

[5] Johnson argues that if there were a bailment, it was a gratuitous bailment to which a gross negligence standard applies, whereas an ordinary negligence standard applies to mutually beneficial bailments. Johnson Reply Mem. at 6. Since, as discussed below, plaintiff does not establish that Johnson failed to act with reasonable care, a fortiori, it fails to prove that he acted with gross negligence.

presumption of negligence "may be overcome when it is made to appear that the loss was occasioned by some misfortune or accident not within the control of the bailee; then the onus continues upon the bailor to prove that it was chargeable to the want of care of the bailee").

In this case, the evidence establishes that Johnson was robbed while wearing plaintiff's jewelry.[6] <u>See</u> Isik Decl. Ex. 4 (attaching the police report from December 7, 2000). "The burden of proof, and the burden of going forward, once a theft has been established, rests upon plaintiff bailor." <u>Voorhis</u>, 60 N.Y. 2d at 879-80; <u>Bank of New York v. Colnaghi USA</u>, 220 A.D.2d 327 (1st Dep't 1995) (plaintiff must prove that theft was due to defendant's lack of reasonable care). Plaintiff argues that because Johnson was aware of the jewelry's value he was negligent in leaving the Site at midnight wearing it. Plaintiff claims that Beth Isik informed Johnson that one piece of jewelry, the 14K Diamond Bezel Necklace, was worth "well over $100,000." Pl. 56.1 Statement (Johnson) ¶ 3; Isik Decl. ¶ 27. By contrast, Johnson claims that he was not aware of the value of jewelry. <u>See</u> Johnson 56.1 Statement ¶ 15. Johnson testified in his deposition that he did not "have an idea as to what the jewelry was worth." <u>See</u> Obiol Decl. Ex. I, Johnson Dep. at 25, ln. 15-17; 73, ln. 2-5; 74, ln. 2-3. It is undisputed that Beth Isik, and not Johnson, reported the value of the stolen jewelry to the police on December 6. The Court finds that even if Johnson were aware of the jewelry's value, this alone is

insufficient to raise a genuine issue of material fact as to whether he failed to exercise

---

[6] Plaintiff disputes that Johnson was robbed, but bases its contention on pure speculation. In light of substantial evidence presented, the Court finds that Johnson was robbed. <u>See</u> discussion <u>infra</u>.

reasonable care.

Plaintiff also argues that because the Site was located in a high crime neighborhood, Johnson acted negligently when he left the building late at night wearing valuable jewelry. See Pl. Mem. at 19; Compl. ¶ 73. Martine Capalbo ("Capalbo") of Mars Media testified as follows regarding the neighborhood:

> Q:    Would you consider this location in Queensbridge to be threatening?
> A:    Particularly for this particular artist because that's his neighborhood.
> Q:    Why does it make it more threatening because that's his neighborhood?
> A:    Because any time you bring an artist ... back to his hometown, you are going to create and stir up a lot of fans and a lot of excitement.

Obiol Decl. Ex. J, Capalbo Dep. at 42, ln. 25 - 43, ln. 10. As with plaintiff's first argument, Capalbo's perception alone that the Site neighborhood is "threatening" is insufficient to raise a genuine issue of material fact as to whether Johnson was negligent.

Plaintiff cites two cases in support of its position. Those cases, however, are distinguishable from this one. For example, in Morse v. Homer's, Inc., 4 N.E.2d 625, 626-27 (Mass. 1936), the plaintiff purchased a ring from the defendant for $2,000. Subsequently, the plaintiff delivered the ring to the defendant under an agreement that the latter would sell it for a price greater than $2,000. Defendant would then give the plaintiff $2,000 and retain the rest of the money obtained from the sale. Defendant displayed the ring in a glass showcase in his jewelry store, without any screens covering the glass. There was a door in the showcase that provided access to it from inside the store, which the defendant left unlocked. It was apparent to persons passing on the street that the door to the showcase was unlocked. While the ring was in defendant's

possession, the store was burglarized and the ring was stolen. Based on the defendant's failure to safeguard the ring against theft, the court held that defendant failed to exercise reasonable care. Id. at 627. Plaintiff also cites Hirsch v. Gustafson Co., Inc., 42 N.E.2d 123, 124 (Ill. App. Ct. 1942). In that case, it was undisputed that defendant left plaintiff's jewelry in his car overnight despite clear warnings on the parking lot ticket that there would be no attendant in the lot during that time. The court found that defendant was negligent.

Here, plaintiff points to disputed evidence that Johnson knew how much the jewelry was worth, in addition to Capalbo's testimony that the neighborhood around the Site was "threatening." Unlike in Morse and Hirsch, where the evidence clearly established that defendants failed to adequately safeguard the plaintiffs' property, the evidence here is insufficient to establish that Johnson failed to exercise reasonable care when he left the Site. Moreover, the evidence is insufficient to establish that the risk of a robbery was foreseeable. Because plaintiff has failed to meet its burden, the Court grants summary judgment for Johnson. See Voorhis, 60 N.Y.2d at 879-80 (affirming denial of directed verdict for plaintiff where he failed to establish that theft of suitcase which defendant was charged with watching was due to defendant's negligence).[7]

## II.    Breach of Bailment Against Johnson

Plaintiff moves and Johnson cross-moves for summary judgment as to plaintiff's claim for breach of bailment. In its complaint, plaintiff alleges that it was the rightful owner of the jewelry. As bailee, Johnson allegedly intentionally and without

---

[7] In view of its finding that Johnson was not negligent as a matter of law, the Court does not reach his argument that plaintiff's contributory negligence bars its claim.

authorization from plaintiff, exited the Site wearing the jewelry into a "high crime area."
Compl. ¶ 73. Plaintiff asserts that Johnson's removal of the jewelry from the Site
violated the terms of the bailment. Id. ¶ 74.

In moving for summary judgment, Johnson asserts that the parties did not enter
into any agreement regarding the jewelry. Johnson 56.1 Statement ¶ 7. Moreover,
Johnson contends that Beth Isik never set forth any rules regarding his use of the
jewelry. See Johnson 56.1 Statement ¶ 8. Thus, Johnson contends that there can be no
breach of bailment where plaintiff did not impose any conditions on the alleged
bailment. Johnson Reply Mem. at 5.

By contrast, plaintiff asserts that "Beth Isik informed Prodigy that he was to
promptly return the Jewelry to Ms. Isik in Prodigy's dressing room after the shoot." Pl.
56.1 Statement (Johnson) ¶ 1. Any contention that Beth Isik imposed rules regarding
the jewelry, however, is belied by her deposition testimony:

> Q:  Did you ever at any time tell Prodigy where he can or cannot go while
>     wearing the jewelry that you brought to the set?
> A:  I didn't lay out the rules, no.
> ....
> A:  I didn't say you can't go to the bathroom without returning the jewelry or
>     you can't go on the set without me being present. I just said, you know,
>     this is what you are going to be wearing, that's it.
> Q:  You said that to Prodigy?
> A:  He said, what do you have for me? This is what I showed him.
> Q:  <u>Did you ever tell him he wasn't allowed to leave the premises.</u>
> A:  <u>No, I didn't tell him that.</u>
> Q:  Did you ever have a discussion with anyone else regarding anyone leaving
>     the premises with the jewelry?
>     Mr. Lewis: Before the incident.
> A:  No.

Obiol Decl. Ex. G, Beth Isik Dep. at 247, ln. 14-25; 248, ln. 6-21 (emphasis added).

Even assuming that a bailment had been created between plaintiff and Johnson,

see discussion supra, plaintiff fails to create a genuine issue of material fact as to whether Johnson breached the terms of the bailment by violating any condition that he not leave the premises with the jewelry. Accordingly, the Court grants summary judgment on this claim in favor of Johnson.

## III. <u>Negligence Against Mars Media</u>

Plaintiff moves for summary judgment on its Fourth Claim for Relief asserting negligence against Mars Media. Plaintiff argues that Mars Media was a bailee and that its negligence led to the loss of plaintiff's property. Plaintiff bottoms its claim of bailment on that fact that Beth Isik delivered the jewelry to O'Neal, Kratsa and Capalbo[8] for use during the filming of the video. Pl. Mem. at 17. Mars Media does not dispute that it entered into a contract with plaintiff, pursuant to which plaintiff would provide jewelry for use in the video shoot and that Mars Media would provide plaintiff with proof of insurance. Mars Media 56.1 Statement at 2. In opposing plaintiff's motion for summary judgment, Mars Media does not dispute that it was a bailee of plaintiff's property. Instead, it "[a]ssum[es] that Mars was in fact a bailee of the property," and argues that the theft of the jewelry – and not negligence on its part – caused the loss. Mars Media/XL Opp. at 4.

There is no evidence that Mars Media's negligence caused the loss of plaintiff's jewelry. The theft which occasioned the loss was an unforeseeable event. Plaintiff's

allegations that Mars Media hired security for the shoot do not suggest in any way that

_____

[8] The evidence shows that as the producer of the shoot, Capalbo was working for Mars Media as a "freelancer." Capalbo Dep. at 6, ln. 15-16; 17, ln. 7-9, 21. Although Capalbo did not sign a contract with Mars Media, Mars Media paid her for her work on the video. Id. at 17, ln. 3-4.

Mars Media was negligent.  See Pl. Mem. at 20.  Moreover, to the extent that plaintiff

styles its claim against Mars Media as one for negligent supervision of the security

guards at the Site, see id., it fails to allege facts from which negligence may even be

inferred or to establish that the security guards and Mars Media had an employee-

employer relationship.  See Ehrens v. Lutheran Church, 385 F.3d 232, 235 (2d Cir.

2004).  Plaintiff's motion for summary judgment on this Fourth Claim for Relief against

Mars Media is denied.[9]

## IV.   Negligence Against LOUD

LOUD moves for summary judgment against plaintiff's claim for negligence

against it based on a bailment relationship.  In its motion, LOUD argues that there is no

evidence that it had an agreement with plaintiff regarding the jewelry, nor any

suggesting delivery to or acceptance by LOUD of the jewelry as the creation of a

bailment requires.  LOUD Mem. at 8-11.[10]

In opposition, plaintiff asserts that LOUD is liable as "constructive bailee"of the

jewelry by virtue of its control over Johnson and Mars Media.  See Pl. Opp.

Johnson/LOUD at 3.  Courts define a constructive bailment as follows:  "An implied

bailment arises when one comes into lawful possession of personal property of another,

other than by mutual contract of bailment; such possessor may be treated as a bailee of

property by operation of law and may reasonably be referred to as a constructive bailee."

---

[9]  To the extent that it argues that Mars Media is liable for Johnson's negligence in handling the jewelry, (see Pl. Mem. at 20; Pl. Reply Mem. at 10), plaintiff's motion for summary judgment is denied for the reasons that the Court denies plaintiff's motion with respect to its negligence claim against Johnson and grants defendant's motion for summary judgment.

[10]  Plaintiff does not move for summary judgment on this claim against LOUD.  See Pl. Opp. to LOUD/Prodigy at 1 n.1

Tremaroli v. Delta Airlines, 117 Misc. 2d 484, 485 (N.Y. Civ. Ct. 1983); see also Mack v. Davidson, 55 A.D.2d 1027, 1028 (4th Dep't 1977). Thus, possession by the bailee of the bailor's property is crucial to a finding of an implied bailment.

Viewing all the evidence in the light most favorable to plaintiff, the Court finds that the plaintiff has failed to present evidence establishing that LOUD was a constructive bailee of the jewelry. Plaintiff has presented no evidence that LOUD possessed the jewelry at any time during the two-day filming. See Dubay v. Trans-America Ins. Co., 75 A.D.2d 312, 317 (2d Dep't 1980) (finding plaintiff did not transfer "absolute control and possession" of machine, which plaintiff operated during the accident and did not give possession to defendant). Instead, the only evidence plaintiff presents relates to LOUD's alleged control over Johnson and Mars Media. Plaintiff's argument here is based entirely on facts relating to LOUD's *respondeat superior* liability and not its direct liability as a constructive bailee. Accordingly, the Court grants LOUD's motion for summary judgment on plaintiff's Fourth Claim for Relief to the extent it asserts a claim against LOUD based on direct liability.

## V.    **Conversion Against Johnson**

Plaintiff and Johnson cross-move for summary judgment as to plaintiff's claim for conversion. In the complaint, plaintiff alleges that it was the owner of the jewelry and that Johnson converted the jewelry by removing it from the video shoot location "alone without the knowledge of Isik or its authorization." Compl. ¶ 79. The complaint further alleges that Johnson "stole the Jewelry by giving it to one or more co-conspirators who were waiting outside the shoot site." Id. ¶ 80.

"In order to establish a cause of action for conversion it must be proven by a fair

16

preponderance of the credible evidence that (1) plaintiff had legal ownership or an immediate superior right of possession to specific identifiable personal property, and (2) defendant exercised unauthorized dominion over the property to the exclusion of the plaintiff's rights." Aetna Cas. & Sur. Co. v. Glass, 75 A.D.2d 786 (1st Dep't 1980). See also LoPresti v. Terwilliger, 126 F.3d 34, 41 (2d Cir. 1997) ("Conversion occurs when a defendant exercises unauthorized dominion over personal property in interference with a plaintiff's legal title or superior right of possession.").

As to the first element, the evidence is undisputed that plaintiff is the lawful owner of the jewelry. With respect to the second element, plaintiff makes two allegations. First, plaintiff alleges that Johnson "stole the Jewelry by giving it to one or more co-conspirators who were waiting outside the shoot site." Compl. ¶ 80. There is no evidence to support this allegation. Indeed, Beth Isik admitted that she has no evidence that Johnson stole any jewelry:

> Q: As you sit here today, do you have any direct evidence, either formal or written documentation, or any verbal statement given to you that may implicate Mr. Johnson in the theft of the jewelry?
> A: No.

Obiol Decl. Ex. M, Isik Dep. at 49-50. Similarly, Ben Isik, Beth Isik's brother and a co-owner of Isik Jewelry, testified at his deposition that he had no evidence that Johnson stole the jewelry and that he was not aware that his sister had any evidence to that effect. Obiol Decl. Ex. N, Ben Isik Dep. at 49-50.[11]

---

[11] In its opposition to Johnson's motion for summary judgment, plaintiff argues that inconsistencies in the police report and Johnson's deposition testimony regarding whether the robbery occurred before or after he purchased a drink at the convenience store establish that Johnson conspired to steal Isik's jewelry. Pl. Opp. to Johnson's Mem. at 17; see also Pl. 56.1 Statement (Johnson) ¶ 4. The Court finds that any such inconsistencies would not permit a reasonable jury to find that Johnson conspired to

Second, plaintiff alleges that Johnson unlawfully removed the jewelry from the video shoot location "alone without the knowledge of Isik or its authorization." Compl. ¶ 79. In its memorandum of law, plaintiff argues that "By borrowing the Jewelry from Isik, not returning it promptly after the shoot and leaving the warehouse in direct violation of agreed procedures, Prodigy exercised unauthorized dominion over the Jewelry to the exclusion of Isik's right." Pl. Mem. at 15. A claim for conversion requires evidence of an affirmative act by the defendant to interfere with plaintiff's possessory interest in the property. That act can be "asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant." New York v. Seventh Regiment Fund, 98 N.Y.2d 249, 260 (2002). While it is undisputed that Johnson left the Site wearing the jewelry owned by plaintiff, "the mere removal of a chattel from one place to another, in the absence of any claim of ownership or the exercise of any dominion thereover, does not amount to a conversion." O.J. Guide Co. v. Farley, 54 N.Y.S. 998, 1002 (N.Y. Sup. Ct. 1898).

The parties dispute whether Johnson's leaving the building was unauthorized by plaintiff. A conversion encompasses an "unauthorized taking of personal property, and all intermeddling with it, beyond the extent of the authority conferred, in case a limited authority has been given with intent so to apply and dispose of it as to alter its condition or interfere with the owner's dominion." Mendelson v. Boettger, 257 A.D. 167, 169 (2d

steal the jewelry. Since Beth Isik testified that she had no evidence that Johnson stole the jewelry, the Court rejects these arguments as purely speculative. Moreover, the Court notes that the facts that the jewelry was stolen and that plaintiff's demand for its return went unanswered do not establish conversion. See Magnin v. Dinsmore, 70 N.Y. 410, 417 (1877) (no conversion where a party "refus[es] to deliver, on demand, if the goods . . . have been stolen").

Dep't 1939) (emphasis added). Beth Isik testified that she did not condition Johnson's use of the jewelry upon its remaining at the Site. Obiol Decl. Ex. G, Beth Isik Dep. at 248, ln. 14-17; 249, ln. 14-16. The assertion in Isik's affidavit to the contrary is unavailing, namely, that Beth Isik instructed Johnson "that as soon as the shooting ended the Jewelry was to be promptly returned to Ms. Isik in Prodigy's dressing room." See Pl. 56.1 Statement ¶ 29; see also Pl. 56.1 Statement, Johnson ¶ 1. "It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987). Moreover, plaintiff appears to concede that Beth Isik did not "explicitly direct[] Prodigy not to leave the building during the shoot." Pl. Reply Mem. at 2. Thus, plaintiff fails to establish that Johnson's leaving the Site was unauthorized.

In the absence of limiting instructions regarding the jewelry, the crucial question is whether there is other evidence suggesting that Johnson intended to exercise dominion and control over plaintiff's property. The Restatement (Second) of Torts defines conversion as "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." § 222A (emphasis added).[12] See also LoPresti, 126 F.3d at 42 (conversion requires "an intent to exercise dominion or control over property in a manner inconsistent with the rights of another"). Accord Mendelson, 257 A.D. at 170; Meese v. Miller, 79 A.D.2d 237, 243 (4th Dep't

_____

[12] It is undisputed that at least several pieces of plaintiff's jewelry were not returned to it. Thus, the theft "had the effect [ ] of destroying ... the quality of the chattel." O.J. Guide, 54 N.Y.S. at 1000.

1981).

Johnson argues that there is no evidence in the record that he intended to interfere with plaintiff's dominion over the jewelry. Johnson Opp. at 7-8. In opposition, plaintiff argues only that "Prodigy intentionally left the warehouse with the Jewelry after the video shoot was finished." Pl. Reply Mem. at 3.[13] Plaintiff fails to present any evidence establishing that Johnson's act of leaving the Site was an intentional exercise of dominion over the jewelry. Compare New York City Transit Auth. v. New-York Historical Soc'y, 167 Misc. 2d 31, 35 (N.Y. Sup. Ct. 1995) (finding defendant exercised unauthorized dominion over plaintiff's property where it publicly asserted that plaintiff had made a gift of the property to it), with Huntington v. Herrman, 111 A.D. 875, 878 (1st Dep't 1906) (defendant who owned building where plaintiff stored property did not invade plaintiff's right of possession when he leased the building to a third party). Accordingly, the Court denies plaintiff's motion for summary judgment and grants defendant's motion for summary judgment as to this claim.

## VI.  Breach of Contract Against Mars Media

Plaintiff moves for summary judgment on its claim against Mars Media for breach of contract. See Pl. Mem. at 13. Plaintiff alleges that Mars Media promised to provide insurance coverage of $3 million for the jewelry. Further, plaintiff alleges that Mars Media "has failed to return the rented jewelry in its original condition, to pay Isik

---

[13] Plaintiff argues correctly that wrongful intent is not required for a claim of conversion. See Pl. Mem. at 14; Pl. Reply Mem. at 3. Applying New York law, the Second Circuit in LoPresti, 126 F.3d at 42, stated: "Wrongful intent simply is not an element of an otherwise valid conversion claim." See also In the Matter of Re/Max All Pro-Realty, Inc. v. New York State Dep't of State, 292 A.D.2d 831, 832 (4th Dep't 2002) ("a wrongful intent is not an essential element of the conversion") (citation omitted). Thus, it is inapposite whether Johnson intended to leave the Site knowing that he was acting wrongfully.

the value of the jewelry lost or stolen during the video shoot, or to obtain an insurance policy to insure the full value of the jewelry against loss or theft."  Compl. ¶ 51.

Under New York law, a party asserting a breach of contract claim must prove:  (1) the existence of a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages.  See Safire Corp. v. Newkidco, L.L.C., 286 F. Supp. 2d 302, 306 (S.D.N.Y. 2003).[14]

With respect to whether there was an agreement between the parties, plaintiff asserts that, during a phone call with O'Neal of Mars Media on December 5, 2000, it entered into a rental agreement for the jewelry.  Pl. June 11, 2004 56.1 Statement ¶ 6. Later that day in a second phone call, Nina Kratsa, a production manager for Mars Media, confirmed the details of the rental agreement with plaintiff under which it would provide the jewelry for the two-day shoot in exchange for Mars Media's promise to pay plaintiff $750 per day and provide liability insurance coverage for up to $3 million.  In opposing plaintiff's motion, Mars Media contends that there was no agreement regarding insurance between the parties and thus, summary judgment for plaintiff must be denied.[15]

In her declaration, Beth Isik states that she "agreed to supply the jewelry on the

---

[14]  The parties do not dispute the second element, namely, that plaintiff performed under the contract by supplying the jewelry for the video.  Additionally, the parties do not dispute that plaintiff never received all of its jewelry after the robbery and, thus, this satisfies the element of damages.

[15]  Plaintiff does not dispute that Mars Media satisfied its obligation "to pay Isik $750 per day rental fee."  Pl. Mem. at 14; see also Isik Decl. Ex. 2 (attaching Purchase Order Log that shows $1,500 was paid to plaintiff).

condition that, among other things, Mars Media ... arrange for sufficient protection of the jewelry, including adequate insurance coverage in favor of Isik for loss, theft or damage to the jewelry." Isik Decl. ¶ 6. Her deposition testimony reflects the same understanding:

> Q: How about when Martine [Capalbo] called you, what was the substance of the conversation you had then?
> A: My main concern was that I would be insured and the terms.... And I agreed to 750 per day for two days as long as I was fully covered.
> Q: Fully covered, meaning what?
> A: Meaning I was under their – there was sufficient funds to protect my merchandise that I was taking on the set.
> Q: As far as insurance was concerned?
> A: Yes.

Obiol Decl. Ex. G, Beth Isik Dep. at 114, ln. 7-24.

Additional evidence confirms an agreement that plaintiff would be insured. For example, Mars Media faxed an insurance agreement to plaintiff on December 5, 2000 – the day on which the parties orally agreed to the rental of the jewelry – listing the plaintiff as an Additional Insured. <u>See</u> Isik Decl. Ex. 2. Additionally, in its Rule 56.1 Statement, Mars Media stated as an undisputed fact that "as part of that contract [with plaintiff], Mars provided Isik with proof of insurance." Moreover, Johnson proffered a letter dated April 30, 2001 from David Owen, Esq. ("Owen") to Andrew M. Winograd ("Winograd"), attorney for Mars Media, which supports plaintiff's view of the contract. In that letter, Owen states:

> Apart from Mars' clear legal responsibility toward Isik's property as bailee and custodian of it, Mars reaffirmed such responsibility prior to this loss. <u>Attached to this letter is a copy of the insurance and coverage information forwarded to Isik by FAX from your offices prior to the rental of Isik's jewelry</u>. These representations of Mars expressly confirm that Mars contractually assumed any risk of loss arising from its custody of this property.

See Obiol Decl. Ex. K (emphasis added). In view of the evidence and its own Rule 56.1 statement, Mars Media cannot now argue that there was no meeting of the minds between the parties as to the insurance for the jewelry.

Plaintiff argues that Mars Media breached its obligations under the contract because it did not perform on its promise "to obtain insurance for up to $3 million." Pl. Mem. at 13-14. In opposition, Mars Media contends that in its briefs plaintiff characterizes the provision of insurance as a condition precedent to the contract. Mars Media/XL Opp. at 2. Mars Media disputes that plaintiff "expressly conditioned the rental of the jewelry on Mars' providing insurance." See Mars Media 56.1 Statement at 1. It argues that there was no agreement between the parties that Mars Media's provision of insurance for the jewelry would be a "condition precedent" to the rental agreement. Mars Media/XL Opp. at 3. Mars Media concedes, however, that it provided plaintiff with the 12/5 Certificate and argues that "Mars fulfilled that condition by adding the plaintiff as an additional insured on its policy." Id. Thus, even if the insurance coverage were a condition precedent to the rental of the jewelry, Mars Media satisfied this condition by providing the 12/5 Certificate to plaintiff.

Mars Media next disputes plaintiff's contention that it did not provide "adequate" insurance coverage for the jewelry. Mars Media/XL Opp. at 3. The evidence shows that as of the date of the loss, Mars Media had provided plaintiff with an insurance policy that covered up to $3 million in losses. See Isik Dec. Ex. 2. According to Beth Isik, on December 7, 2000, plaintiff contacted Mars Media to obtain compensation for the stolen jewelry. Isik Decl. ¶ 46. On December 14, 2000, Mars Media sent plaintiff a

different insurance contract than the one it had faxed on December 5. Isik Decl. ¶ 48, Ex. 5. That contract is dated "12/14/00" and reflects coverage of $1 million for "Props, Sets & Wardrobe" with a $150,000 "jewelry sublimit." See Pl. 56.1 Statement ¶¶ 29, 31-33. Plaintiff formally demanded payment for the loss of the jewelry from Mars Media by letter dated April 30, 2001, but, as of October 2001, Mars Media still refused to make payment. Isik Decl. ¶¶ 65-66.

Mars Media provides no explanation for the amendment to the Certificate other than that "It was later determined that this insurance was subject to a sublimit of $150,000." Mars Media/XL 56.1 Statement. It presents no evidence showing a genuine issue of material fact as to the effectiveness of the agreement to insure plaintiff on December 7 when the jewelry was stolen. Rather, Mars Media argues that the value of the jewelry is an issue of fact precluding summary judgment in favor of plaintiff. Mars Media/XL Opp. at 3. This attempt to thwart summary judgment is unavailing. The evidence that Mars Media decreased the insurance coverage after the theft of the jewelry establishes that it breached its obligation to provide $3 million in insurance coverage for the jewelry. Accordingly, the Court finds that plaintiff is entitled to summary judgment on its breach of contract claim against Mars Media.

## VII.  *Respondeat Superior* Liability Against LOUD

Plaintiff moves for summary judgment against LOUD claiming that it had a principal-agent relationship with Mars Media and Prodigy and is therefore liable under the doctrine of *respondeat superior* for their wrongdoing.[16] Pl. Mem. at 2. LOUD cross-

---

[16] As discussed above, the Court grants summary judgment in favor of Johnson as to plaintiff's Fourth Claim for Relief, negligence, Fifth Claim for Relief, breach of bailment and Sixth Claim for Relief, conversion. Accordingly, the Court grants summary judgment to LOUD as to plaintiff's *respondeat*

moves for summary judgment on these claims and argues that it is not subject to secondary liability for the acts of Mars Media and Johnson because they were not its employees.

## A.    Plaintiff's Failure to Plead *Respondeat Superior*

LOUD contends that the Court must reject the theory of *respondeat superior* liability because plaintiff belatedly raises that theory in its memorandum of law (see Pl. Mem. at 21) rather than pleading that theory in its complaint.  LOUD Opp. at 4.  In response, plaintiff argues that LOUD discussed *respondeat superior* liability in its October 23, 2003 motion for summary judgment and cannot now claim any prejudice. Pl. Reply Mem. at 12.  Moreover, plaintiff argues that it need not plead this theory of liability and that its assertion of a negligence cause of action against LOUD in the complaint provided sufficient notice to defendant under Fed. R. Civ. P. 8.  Plaintiff further argues that even if it was required to plead *respondeat superior* liability against LOUD, this Court should permit plaintiff to amend its pleadings under Fed. R. Civ. P. 15.

The Second Circuit has held that a court may consider a plaintiff's argument regarding *respondeat superior* liability where there is evidence presented relevant to that theory, notwithstanding that plaintiff failed to allege its elements in the complaint. See Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 711 (2d Cir. 1980).  The court's holding in that case is instructive:

> While plaintiffs have not denominated their argument in this court and in the district court a respondeat superior argument, and the complaint did not contain the traditional allegation that [the broker] made representations relied upon in the course of his employment with [the brokerage house], the evidence upon which plaintiffs rely in this court, as in the district court, and the allegations of

*superior* claim against LOUD to the extent that it is based on Johnson's liability.

> fact made in the complaint are alike completely descriptive of the transactions
> and of the roles of the actors in them, and they are the evidence and the
> allegations relevant to a determination of the respondeat superior issue....

Id.; see also Laro, Inc. v. Chase Manhattan Bank, 866 F. Supp. 132, 139 (S.D.N.Y. 1994)

(considering plaintiff's *respondeat superior* claim even though it was "not separately

pleaded in the complaint"). The Marbury court based its ruling on the general

proposition that "generally a complaint that gives full notice of the circumstances giving

rise to the plaintiff's claim for relief need not also correctly plead the legal theory ...

supporting the claim." 629 F.2d at 712.

Here, the complaint alleges that "Upon information and belief, Prodigy is an

artist under contract with LOUD, and Prodigy and LOUD had retained the services of

Mars Media to produce the video." Compl. ¶ 16. Moreover, plaintiff alleges "Upon

information and belief, present at the shoot and participating in the shooting were

several representatives of Defendants Mars Media and LOUD." Id. ¶ 30. These

allegations describe the purported role of LOUD in the transactions underlying the

complaint based on its contractual relationship with defendants. See Marbury, 629 F.2d

at 711. Thus, LOUD had sufficient notice under Fed. R. Civ. P. 8(a)[17] of the basis for

plaintiff's claim. See Ricy Finance Corp. v. Paine, Webber, 1986 WL 1195, at *9

(S.D.N.Y. Jan. 17, 1986) (finding defendant had notice of basis for plaintiff's claim where

plaintiff did not use the words "respondeat superior," but alleged elements).

Moreover, as in Marbury, the evidence in this case sufficiently describes the

relationships between LOUD, Johnson and Mars Media for this Court to consider

---

[17] Rule 8(a)(2) provides that a pleading "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."

LOUD's *respondeat superior* liability. For example, the evidence shows that LOUD entered into contracts with Johnson and Mars Media. There is also deposition testimony about LOUD's involvement in the production on December 5 and 6, 2000. See, e.g., Lewis Decl. Ex. 4, Ruderman Dep.; Lewis Decl. Ex. 10, Capalbo Dep.[18] Accordingly, LOUD was given sufficient notice of plaintiff's theory of *respondeat superior* liability.

In support of its position, plaintiff also invokes Rule 15(b) of the Federal Rules of Civil Procedure, which provides that a court may consider issues "not raised by the pleadings," but litigated with the "express or implied consent of the parties." Plaintiff argues that even if its *respondeat superior* theory is not properly pleaded in the amended complaint, LOUD has impliedly consented to litigate that issue. Rule 15(b) is satisfied where "the claim may actually be introduced outside the complaint — say, ... in a pretrial memorandum — and then treated by the opposing party as having been pleaded, [] through his effective engagement of the claim...." Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1172 (1st Cir. 1995). In its briefs, LOUD disputes the applicability of *respondeat superior*. See LOUD Opp. at Point II. By engaging a theory of liability in a "pretrial memorandum," LOUD impliedly consents to this Court's consideration of *respondeat superior* liability.

### B. *Respondeat Superior* Liability for Mars Media's Acts

Plaintiff argues that LOUD exercised control over Mars Media in connection with

---

[18] LOUD argues that it has been prejudiced by plaintiff's failure to plead *respondeat superior* liability. See LOUD Reply Mem. at 9. It contends that because the issue was not "asserted by plaintiff in a proper manner prior to the conclusion of pre-trial discovery," it was not able to tailor discovery demands to the issue of *respondeat superior* liability. Given that testimony and evidence obtained during discovery describe the relationship between LOUD and the defendants, the Court rejects this argument.

the video shoot and therefore is subject to *respondeat superior* liability for the latter's actions. Pl. Mem. at 22. In opposition, LOUD argues that "Mars Media was paid by the job, had its own employees, arranged for the loan of the jewelry and selected the jewelry. LOUD did not reserve the right to control Mars Media's work and it did not control the work." LOUD Mem. at 11. As an initial matter, LOUD argues that Mars Media was designated an independent contractor in its December 4, 2000 contract with LOUD. That contract provides:

> In entering into this agreement and in providing the services pursuant herein you have and shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute you as our agent or employee and neither we nor you shall have any authority to bind the other in any way.

Lewis Decl. Ex. 2 ¶ 11. See also LOUD 56.1 Statement ¶ 7 (describing Mars Media as an independent contractor).

Courts hold that "[t]he mere fact that a contract designates a party as an independent contractor is not dispositive of the issue" of *respondeat superior* liability. Matter of Gallagher, 259 A.D.2d 853 (3d Dep't 1999); Shah v. Lokhandwala, 265 A.D.2d 396, 397 (2d Dep't 1999) (same). Instead, courts examine the relationship between the parties to determine whether the actor is an independent contractor or an employee for purposes of tort liability. "Control of the method and means by which the work is to be done [] is the critical factor" in that analysis. Berger v. Dykstra, 203 A.D.2d 754 (3d Dep't 1994). The New York Court of Appeals set forth the test for distinguishing between an employee and an independent contractor:

> The test is the existence of a right of control over the agent in respect of the manner in which his work is to be done. A servant is an agent who works under supervision and direction of his employer; and independent contractor is one who is his own master.

In re Miller, 284 N.Y. 167, 172 (1940). On a motion for summary judgment, whether one is an independent contractor or an agent "usually presents a question of fact, but when the evidence in the record on the issue of control is undisputed, the matter may properly be determined by the court as a matter of law." Berger, 203 A.D.2d at 754.

Plaintiff argues that LOUD hired Mars Media. See Lewis Decl. Ex. 4, Ruderman Dep. at 47, ln. 13-18; Obiol Decl. Ex. J, Capalbo Dep. at 36, ln. 17-22. The contract between the parties provides that LOUD "shall have approval with respect to all aspects of production of the Picture" (Lewis Decl. Ex. 2 ¶ 4). Although that language is not dispositive on the issue of *respondeat superior* liability, it is evidence of LOUD's right to control the video shoot. Furthermore, plaintiff presents evidence that Melissa Ruderman ("Ruderman"), the Vice President of LOUD in 1999 and 2000, was present at the shoot and supervised the video production to suggest that LOUD exercised control. Lewis Decl. Ex. 4, Ruderman Dep. at 16, ln. 20-22. Ruderman testified that the purpose of her attendance at the shoot was "To make sure that the agreement that we signed off on was being shot, that our money is being spent well. That the artist is getting what they need. That the director is doing his job, and the production company." Id. at 17, ln. 11-15.[19] According to Capalbo, who worked for Mars Media, Ruderman was responsible for "VP which means video production. So I'm assuming she was hired by Loud Records to supervise music video productions that happen for their artists." Lewis Decl. Ex. 10, Capalbo Dep. at 44, ln. 18-21.

_____

[19] Plaintiff suggests that the facts that Ruderman reported to the President of LOUD regarding problems on the shoot and that she was required to get the President's authorization for expenses in connection with the shoot indicate LOUD's control over the production through Ruderman. See Pl. Reply Mem. at 19. The Court finds that these facts only describe the relationship between LOUD and Ruderman and are not relevant to any agency relationship between LOUD and Mars Media.

Plaintiff argues that LOUD controlled Mars Media's hiring decisions for the shoot. Capalbo testified that "There's a lot of things that employees of Loud had told me they needed or people needed to be hired." Lewis Decl. Ex. 10, Capalbo Dep. at 87, ln. 19-21. Yet there is evidence to the contrary in the record which suggests that LOUD, through Ruderman, did not control all aspects of Mars Media's hiring for the video. For example, Mars Media hired security for the production. See Polin Decl. Ex. L, Ruderman Dep. at 47, ln. 4-15. Ruderman testified that she had no control over the security. Id. at 46, ln. 25 - 46, ln. 3. Moreover, according to Capalbo, she and her "production team" hired vendors from whom they, for example, rented equipment for the shoot. See Obiol Decl. Ex. J, Capalbo Dep. at 20, ln. 9-17. See also Polin Decl. Ex. L, Ruderman Dep. at 40, ln. 18-19.

Plaintiff also argues that Ruderman had artistic control over the video shoot. However, plaintiff overstates Ruderman's testimony with regard to her duties on a video shoot in general, to suggest that Ruderman provided all of this direction on December 5 and 6 when the video starring Johnson was filmed. Ruderman testified: "Sometimes I would be involved in casting decisions, sometimes be involved in wardrobe decisions, make-up decisions, it depends." Lewis Decl. Ex. R, Ruderman Dep. at 20, ln. 18-21.

Also referring to her video shoot responsibilities generally, Ruderman testified that "There has been times where I would go to a jewelry store myself and buy it for [the artist] if that was something approved.... You know there is also a thing called product placement a lot of artists get free clothes from designers to wear in their videos. That would be something I would handle...." Id. at 24, ln. 4-13.

With respect to this shoot, however, the evidence is clear that LOUD, through Ruderman, had nothing to do with arranging for the jewelry rental. Isik testified that she never gave any jewelry to an employee of LOUD. Isik Dep. at 227, ln. 16-19. Moreover, Isik was asked at her deposition: "Other than the conversations you testified to that you had with Mars Media and Nina, Ms. Martine and Mr. O'Neal, did you ever have any conversations with anybody from Loud in regard to the rental of this jewelry?" Isik responded: "No, because I received a call from O'Neal and he put me onto the people in charge of the video shoot that day." Id. at 243, ln. 14-21. Additionally, Ruderman testified with regard to the jewelry that she "[d]idn't know where it came from" and that she "had nothing to do with the ... rental of that jewelry." Polin Decl. Ex. L, Ruderman Dep. at 39, ln. 15-16; 60, ln. 21-22.

In view of the disputed evidence concerning LOUD's control over Mars Media's work, the Court finds that there is a genuine issue of material fact as to whether the actions of Mars Media can properly be imputed to LOUD under the doctrine of *respondeat superior* precluding summary judgment. Therefore, summary judgment is denied.

## VIII. <u>Breach of Contract Against XL</u>

Plaintiff moves for summary judgment on its breach of contract claim against XL. <u>See</u> Compl. Third Claim for Relief. It argues that it was the intended third-party beneficiary of the insurance contract between XL and Mars Media as evidenced by the notation on the 12/5 Certificate with regard to Isik Jewelry: "Certificate Holder is

included as an Additional Insured for claims arising from the operations of the Named Insured," namely, Mars Media.  Pl. Mem. at 24.  Because XL agreed to provide $3 million of coverage for the loss and has failed to pay Isik under the insurance policy, XL is liable for breach of the insurance contract to plaintiff.  Id. at 25; see Compl. ¶ 63.  Furthermore, plaintiff argues that the efforts of Mars Media to substitute reduced coverage on December 14 do not relieve XL of its obligations under the 12/5 Certificate.

As an initial matter, XL does not dispute that plaintiff was the intended third-party beneficiary of its insurance contract with Mars Media.  Courts hold that an owner of bailed property may assert a direct claim against the bailee's insurer where the terms of the insurance policy provide for such a claim to be asserted.  See CBF Trading Co., Inc. v. Hanover Ins. Co., 603 F. Supp. 685, 687 (S.D.N.Y. 1984) (interpreting insurance contract provision that any loss can be adjusted by the insured – defendant bailee – or the owner of the lost property to give the owner a direct claim against the insurer).  Here, because plaintiff was named as an Additional Insured on the contract between XL and Mars Media, the Court finds that it can enforce the insurance contract against XL.

Courts' analysis of breach of insurance contract claims are similar to their review of breach of contract claims generally.

> Contracts of insurance, like other contracts, are to be construed to effectuate the parties' intent as expressed by the words the parties used, and if the terms of the contract are clear and unambiguous, the Court must enforce the plain, ordinary and common meaning of those terms.  Accordingly, the Court must first determine as a matter of law whether the terms of the contract are ambiguous, and if the opposing party proffers a reasonable interpretation and submits supporting extrinsic evidence over which there is a genuine dispute, summary judgment is precluded.

Auto Caravan Corp. v. Ins. Co. of N. Am., 1988 WL 74999, at *2 (S.D.N.Y. July 8, 1988).

In this case, the 12/5 Certificate clearly and unambiguously states that plaintiff, as the

Certificate Holder, is an Additional Insured, and reflects a $3 million coverage limit. It

is undisputed that XL has not paid plaintiff for the loss of the jewelry pursuant to the

policy. Thus, XL has breached its obligation to plaintiff.[20]

In opposition to plaintiff's motion, XL does not dispute that it provided plaintiff,

as an Additional Insured, with $3 million of liability insurance coverage that was

effective on the date of the loss. Instead, XL argues that "plaintiff made material

misrepresentations regarding the value of the 'lost' jewelry and, as such, is not entitled

to reimbursement under the policy." Mars Media/XL Opp. at 6. Specifically, XL

contests plaintiff's claim that of the five pieces of jewelry returned to LOUD on

December 18, 2000, three were "facsimile copies" of the loaned pieces while two were

the same pieces that plaintiff gave to Mars Media for the shoot. Id. According to XL's

expert witness, Elie Ribacoff ("Ribacoff"), it would take a "miracle" for three pieces to

have been copied in the twelve days between when they were stolen and when they were

delivered to LOUD. Vetter Decl. Ex. B, Ribacoff Dep. at 83, ln. 22. Based on that

testimony, XL argues that the pieces delivered to LOUD on December 18 were the same

as the ones stolen on the morning of December 7, and that the jewelry never contained

real diamonds. Therefore, XL argues, "plaintiff has made material misrepresentations

by consistently exaggerat[ing] the value of the loss in this case." Mars Media/XL Opp. at

---

[20] The fact of the 12/14 Certificate does not alter the Court's finding that XL is liable for nonpayment because the evidence in the record shows that at the time of the loss, the plaintiff was covered by the 12/5 Certificate. The evidence establishes that the loss of the jewelry occurred in the early morning on December 7, plaintiff informed Mars Media and XL about the theft later that day and Mars Media faxed plaintiff the 12/14 Certificate indicating a $150,000 sublimit for the jewelry one week later.

8.  Further, it argues that those misrepresentations trigger a provision in the policy which states that a party's false or fraudulent claim as to a loss renders the policy void.

Plaintiff clearly states that it moves this Court for an order granting summary judgment as to liability alone and not as to damages.  Thus, any dispute as to the value of the jewelry concerns damages and is immaterial to XL's liability to plaintiff.  <u>See</u> Pl. Opp. at 12.  XL may not manufacture factual issues to defeat plaintiff's motion for summary judgment.  In any event, XL presents no evidence that plaintiff misrepresented the value of the jewelry other than the deposition testimony of Ribacoff that it would have been a "miracle" for a jeweler to copy the three pieces by the time they were recovered.  XL presents no evidence to establish that, under the language of the insurance policy, plaintiff "knowingly concealed or misrepresented any material fact or circumstances concerning this insurance" or that plaintiff committed any "fraud or false swearing" or made "any false or fraudulent claim."  <u>See</u> Mars Media/XL Opp. at 8; <u>see</u> Vetter Decl. Ex. A. "General Policy Considerations" at 1.  Accordingly, because XL fails to raise a genuine issue of material fact regarding its liability to plaintiff based on the 12/5 Certificate, the Court finds that plaintiff is entitled to summary judgment.

## **CONCLUSION**

For the reasons stated above, the Court:  (1) grants summary judgment in favor of Johnson as to the Fourth Claim for Relief asserting negligence; (2) grants summary judgment in favor of Johnson as to the Fifth Claim for Relief asserting breach of bailment; (3) denies plaintiff's motion for summary judgment as to the Fourth Claim for

Relief asserting negligence against Mars Media; (4) grants summary judgment in favor of LOUD as to the Fourth Claim for Relief asserting negligence; (5) grants summary judgment in favor of Johnson as to the Sixth Claim for Relief asserting conversion; (6) grants summary judgment in favor of plaintiff as to the First Claim for Relief asserting breach of contract against Mars Media; (7) denies summary judgment as to LOUD's *respondeat superior* liability for the actions of Mars Media; (8) grants summary judgment in favor of plaintiff on the Third Claim for Relief asserting breach of contract against XL.

      SO ORDERED.

Dated:      Brooklyn, New York
               December 9, 2005

                          S/ _____
                            I. Leo Glasser
                            United States District Judge

Copies of the foregoing were sent on this day to:


Robert Y. Lewis
Freeman Lewis LLP
228 East 45th Street
17th Floor
New York, NY 10017


Gregory G. Vetter
Wade Clark Mulcahy
111 Broadway
New York, NY 10006


Andrew D. Polin
Polin, Prisco & Villafane
One School Street
Glen Cove, NY 11542


Richard C. Obiol
Law Offices of Stephen Civardi, P.C.
265 Sunrise Highway
Suite 30
Rockville Centre, NY 11570